All rise. Hear ye, hear ye, hear ye, this Honorable Bill O'Connor for the Second District is back in session, pursuant to paragraph in honor of the Land Grant Majority Supervisory Committee. Thank you, Your Honor. We'll wait. It was our fault that we were just a little bit late getting started. Mr. Lutcher would be happy to proceed with Honor of the Home. All right. Let the record now show that everybody's present. Please be seated. Your Honor, this is a fine piece of morning call.  On behalf of the Counselor, Mr. Paul Cavalocchi, Robert Smith, on behalf of the Estate, Mr. David Lutcher. Are both sides ready to proceed? Yes. Counsel, you may proceed when you are ready then. I just need a moment, please. Sure. I'm ready, Your Honor. You may proceed when you're ready then. Good morning, Your Honors. Counsel. I'm sorry. Justice Jorgensen. He's not a guy. He's a colleague. Good morning, Your Honors. May it please the Court, my name is Robert Smyth. I represent the plaintiff, plaintiff, Paul Kalsikoff of McHenry as his appellate attorney. Paul was represented at trial by Guy Uman of McHenry. This case came here on appeal from the Circuit Court of McHenry County, the Probate Division, which under directed verdict in favor of the defendant, the State of William E. Walsh. Directed verdict or directed finding? Directed finding. There was no, thank you, Your Honor. Paul filed a multi-count claim to obtain at least $387,000 plus costs for unpaid upholstery and furniture refinishing services provided to the decedent's American Upholstery and Refinishing business in Chicago, then Palatine, then McHenry. He also filed a claim for $7,800 plus costs for in-home caretaking services provided to the decedent after he had a stroke in Wonder Lake, Illinois. After returning from Germany at age 29, Paul was hired by, resided with, and worked for the decedent from April 1981 until June of 2008 when the decedent passed away. You know, I think we know the facts of the case, so if you want to move on and argue your issues, why you believe Paul should, we should reverse the trial court. Okay. Our brief outlined three main issues. I'm going to attempt to handle the second issue, which involved waiver of application of the Dead Man's Act. We relied on a case in Balma and a Supreme Court case in Rennick and the Supreme Court case in Man's Materials. And what we're trying to argue or what we're arguing is that by the opposing side attaching a copy of a will and attaching written interrogatories to a motion to bar testimony of the decedent's CPA accountant, that we ought to be able to put Paul back on the witness stand to examine those documents and that arrangement between Paul and the decedent. Why were those documents attached? It was attached by the other side. Right, but why? What was the purpose of the attachment? The purpose of the attachment, we believe, because I'm the appellate attorney, I wasn't at the trial, but I believe what they were attempting to do is show that since the trial attorney failed to place the CPA James Ketchbark's name on the witness list, that somehow in those items, in those written interrogatories and in that copy of the will, the CPA accountant would not need to be called because there was no information apparently in those documents to call the CPA. So it was going to the truth of the matter. Truth of the matter. Yes. And we also believe that by excluding those items once they were presented by the opposition, that that substantially prejudices Paul and Paul's case, that the outcome of the case is completely changed. Because the inference is there's some sort of an arrangement between a person who's deceased and a person who works for 27 years for no pay. There has to be some sort of an arrangement there. Or one can infer that maybe he's being paid in cash, correct? That's very possible, but there is no cash. The cash was taken from a safe by the two daughters and hired a locksmith to open up the safe and took the strong box with all the important papers of the deceased. Let me ask you this. Mr. Yellman at the trial court level had an opportunity to put testimony in from someone other than an interested party to skirt the issue of the Dead Man's Act. Did he attempt to do that anywhere? Well, there isn't anybody else that witnessed to it other than the heirs, the four children of the decedent. And there's the first wife is deceased. The second wife, Naomi, is deceased. And the decedent is deceased. So there's nobody left to actually testify to those facts in that arrangement. Every time that Paul attempted to talk about the arrangement, it was obviously in the presence of the decedent, so the opposition objected. He wasn't able to talk about that. So what we're saying, again, is that it's prejudiced the case, that the outcome of the case is completely different. And we would like the opportunity to put Paul back on the witness stand and let the other side have the opportunity to cross-examine him as to the arrangement between the decedent and Paul. Doesn't that defeat the purpose of the Dead Man's Act? It does as far as the first piece of it. But the second piece of the Dead Man's Act is not to prejudice the living and not to prejudice the case, not to change the outcome of the case. In our brief, we also, if I may move on, our first issue involves how the presumption of gratuitous services arises in the first place. And it seems that we have cited the estate of white. The other side has cited the estate of white. So we're citing the same law, but it's how the law is applied that seems to have some slippage. There's factors laid out in the estate of white, several of them, and Paul seems to meet those factors to deflate or to allow the presumption of gratuitous services to vanish. If I may just take a second to grab the case, I could go through a few of those factors. The court of whites laid out the factors that will rebut or corroborate a presumption of gratuity. Now, somehow the court views a presumption of non-gratuity and the presumption of gratuity as the same thing. So I guess we're playing with semantics, looking at it from the reverse angle. But if I look at the factors that defeat the presumption of gratuity, such as circumstances of the case like the origin of the services or the failure or the inability to make return either in kind or otherwise, the reciprocity of the services. Paul provided the services for almost 30 years doing arduous upholstery, working in the basement till midnight at the decedent's home on upholstery during holidays. And these factors are all met by the case and the facts by Paul. Extraordinary services, certainly not incident to any normal domestic arrangement. Paul's not sweeping the floor and washing the windows. Paul is running the business and answering the phone and ordering materials. But he's not sharing in any profits. There's no evidence of any wages being paid. There is no cash payment to Paul. The CPA testified to that effect. The financial conditions of the parties. Somehow the decedent ends up with an estate of nearly $3 million. And the person that helped create the estate to allow the decedent to invest in those properties ends up with nothing. Isn't it a little hard to believe that Paul, how old was Paul at this point? He's probably in his 40s. He came in when he was 29. So he's in his 40s, early 50s. Paul was born in America. But at age five, he went to live with his grandmother. So at age 29, he came back when his grandmother died. There is a slight excuse me. I'm sorry. There is a slight language barrier. You can tell in the testimony, a little bit in the transcripts, that Paul doesn't exactly understand everything in the English language because he's been speaking German from the time he was six to the time he was 29. But it is a little hard to believe that someone can work all those years without pay. But the decedent wouldn't allow him to have a driver's license, so he's dependent on the decedent. Did a friendship develop? I noticed that was in the facts. Did anyone preclude him from getting a driver's license? He testified that he couldn't obtain a driver's license because the decedent wouldn't allow him to. And he felt under the spell of the decedent that he would be thrown out on the street if he got a driver's license? And where is the testimony to support that? It's possible that since he was thrown out of his household in America at age five and came back from his grandmother's residence at age 29 as a steelworker, it's very possible that the inference is that he's going to be thrown out again if he messes with the decedent. So there is no testimony? There's no testimony to that direct point. But any time there was possible testimony in the presence of the decedent or an event involving the decedent, the opposition objected based on the dead man's act. How did we get in testimony then that he was prevented from getting a driver's license? That was asked because it wasn't in the presence of the decedent. I have that. Do I need to cite that for you? That would be helpful. Okay. Well, we'll let you submit that later. Okay. But in the end, on the presumptions, were both sides appear to be looking at the law in the same way but not the application of the law? All of these factors were met in Paul's case. The presumption diminishes in direct proportion based on these factors that are met. So you're attempting to show us or attempting to submit to the court that based upon the financial discrepancy, he being worth $3 million, Paul being worth nothing, the driver's license, et cetera, et cetera, Paul was basically involuntary. It was involuntary servitude, if you will. It's almost like a servant or slavery over a long period of time. It's very much like that. I believe Paul was so dependent on the decedent while the decedent was living, And then over time, Paul began to run the business. Instead of just being the upholsterer, he must have developed the notion that had the business failed or he stopped working, he wouldn't share in the rearrangement that they had, which written in the derogatories basically said he would be investing $15 an hour of pay towards these properties over time. So there were conversations in those written derogatories between the decedent and Paul that described the arrangement and that he would question the decedent from time to time, am I taken care of? Has this been taken care of? And that's where the copy of the will as Exhibit A to those written derogatories was very important to our case. The income tax return for the business went through another business, did it not? We believe it did, but that was a different business. Was there any indication in any of the business records or income tax returns that indicated that any salaries or hourly wages were given to anybody? The bookkeeper of the business, who is the daughter and is an heir, was paid to do bookkeeping for the business. Tammy Walsh was paid, and that came out in testimony. And she was the only one paid? John Walsh, the son, was also paid to do upholstery services. He had a separate upholstery business, but he did some upholstery and some union housework for remodeling a house because they had rental properties as well they were developing. So the son, John Walsh, the youngest son, was paid. Mr. Smith, didn't John make a claim? Yes, he did, and that's pending as far as I know. There was also a second claim by a David Clark, and that's settled for $4,000. And he testified that it was a nightmare dealing with the decedent over his arrangement. I think he was owed $8,000, and he settled for $4,000. Was he the one that said that the decedent doesn't like to sign agreements? I believe so. I believe that was the worker that... So there's nothing to indicate that your client was ever paid either a salary or an hourly wage? Nothing. And the CPA, James Katchmark, testified to that. He had nothing. James Katchmark has nothing as far as paying Paul. Didn't he also, though, testify that it wouldn't be unusual that there would be cash payments that would not be recorded anywhere? I don't recall that testimony. He might have said that. I don't recall that. But any cash there was was in a safe in Paul's closet that was broken into and the cash was taken. Some of it was returned. You're not trying to tell us that over 29 years all the cash that may or may not have ever transferred hands was in that safe? Well, there was $105,000, but there may have been more. We really don't know. And where was the safe located? It was in Paul's closet. Paul had no combination to it. This occurred a week after the decedent died. Paul was living in that house. He didn't have it. And that's where it's very possible the original will was, too, because it was a strong box with all the important papers of the seat and car titles and things like that. Let's talk about the familial relationship. You have some individual testify to that he referred to Paul, sometimes referred to him as his dad, or people referred to them as father and son. That's how close they were. Their relationship got close. It was a friendship. One depended on the other, but there was no reciprocity. Paul was the one working until midnight in the basement or working on upholstery. The son, John Walls, testified that Paul worked 24 hours a day, seven days a week, 365 days a year practically. He worked during holidays. If the friendship arose, which it probably did, it never developed into a family relationship because why are you paying one son and one daughter for services and not this other person if this is a family relationship? Well, isn't Paul the only one who lived in the house? He's the only one that lived in that house. That's correct. But John was at the business on a regular basis. He and Tammy would come in and do the books. Kathleen Walsh testified that, do you think Paul has been paid everything he's due from one day to the other? I don't remember the dates. And Tammy said, I find it defies logic that someone would work for nothing all those years. But that's what he did. I don't think he wanted to be kicked out on the street. That happened to him before. So he stayed in there thinking he's investing in these properties and sharing in the wealth. Couldn't the court find that if he's not getting paid for 20 or 29 years that he was performing these services gratuitously? Is it unreasonable for the court to reach that conclusion? I mean, as the daughter said, it defies logic. It defies logic that that would happen. If it was just household chores, washing windows, repairing a door, vacuuming the rugs, you could probably draw that conclusion. He's running the business. In the last eight years of the decedent's life, Paul is the business. They provide him a cell phone. They provide him health insurance. But they're not providing him any pay. He's providing the house. He's living in a room. Food. But is that a family relationship, that someone is working 24-7 to run a business? That goes beyond a family relationship. Is there any testimony that Paul was relegated to his room? He wasn't in prison, but he can't go anywhere without a driver's license. Well, no. I mean, when you say he had a room, he lived in the house. He had a bedroom. And he could use the kitchen and the living room and the den and the bathrooms and whatever all else. Sure. I mean, he was not a boarder who, here's your room, here's your bathroom, that's it. Meals are provided. But you don't get the run of the house. That does not appear to be the town or the relationship. That didn't come out in testimony, no. But he was imprisoned running that business, because without him there is no upholstery going on anymore. And the whole business fails. And the decedent had purchased these apartments. But yet he chose to stay. He stayed thinking he's investing in this business over time and that at some point the decedent is going to pay him. If the decedent kicks him out. And after 27 years, he hasn't been paid and he has no agreement, no written agreement. No written agreement. Doesn't that begin to defy logic as well? It could, but in this case, he is the business. How do the taxes get paid? If you attempt to make an offer, or I should say you, did your client's attorney at trial attempt to make an offer of proof as to whether there was an oral agreement? And if there was, what was it? Such as an express oral agreement from language? Yeah. I don't recall that. So there isn't even an offer of proof of what your client thought he was going to get out of it. Is that correct? Well, he did, in the written interrogatories, did answer to the effect that he did believe he was investing in these businesses. And that they would have short conversations from time to time with the decedent about how his $15 an hour wage is going towards the properties. But at some point, the properties get lost if the business shuts down. The decedent has had a stroke, can no longer do upholstery, so someone has to run that upholstery shop. And Paul ran that 24-7. That provided the money for the decedent to invest in these properties, pay the taxes, secure tenants. It's more than an upholstery shop. It was a real estate venture. Then if it were a real estate venture or some type of a partnership, wouldn't it have behooved Paul to enter into some type of agreement or something with this man? Absolutely. Who notably was a cheapskate, if you will. Even with his own children. Absolutely. That would make sense. But you're dealing with a person who's a little bit, to avoid simple is too strong, but a little bit naive, dedicated, not overly officious, not dutiful. But he didn't want to see the whole thing collapse. So he stayed in there running this operation, thinking that there's going to be a payout at some time in the future. And that's what that will was provided by the decedent. The copy of the will came from Paul. He doesn't have the original. He believed the original was in the safe and it's lost or stolen. And the cash was in the safe, or some of the cash was in the safe. And much of that, some of that was returned. Well, now you seem to be saying that it was his understanding that he was going to be compensated or remunerated. At some point. At least, at minimum, the point of death or probate. At the minute. The decedent's estate would comply with the will and he would get whatever the will said, correct? Possibly. But the house was sold and the will was from 1996. So that is correct. However, time marched on. That property was sold and new properties were purchased. And they moved the operation up to McHenry, where he ran that shop. He filed the claim thinking the claim would go through. He filed the claim just a month or two after the death. But he did not realize the importance of the original will. He didn't understand that. Now, you rely on the ingrated estate of Brumshagen, and certainly Brumshagen is a little different than what we have here. It's a little different and it uses some of the same law, but it's a little bit of a different application of the law. The farmer in Brumshagen didn't get anything from the old man or the dying man. He didn't live in his house, correct? That's right. He didn't have his insurance paid, his phone paid, nothing like that. Are you trying to analogize Brumshagen because it's a different business other than housekeeping? We're trying to say that the general rule in Brumshagen applies, but that the circumstances are different. And we rely more on, as the opposition does, on the estate of White. I did cite Brumshagen for the general proposition, but I think White is the one that seems to control even more because of the factors that are laid out from the American jurisprudence second restitution and implied contracts. And Paul meets those factors to deflate the presumption. The only confusion with White is they're stabbing a tire that's already deflated when they say the presumption of non-gratuity is burst. It's the presumption of gratuity that gets burst. We assume that people are paid for their hard work. So if the presumption arises like a bubble, then it's burst. But in White, they turned it around and said, well, the presumption of non-gratuity is burst. And that's what Judge Sullivan and the opposition argue. So we argue the law is applicable to Paul's case. We're just looking at the factors that say that this isn't ordinary household duties that he's doing. This is much more complicated. And the decedent is charging for those services. Paul's not enriching. He's not being enriched by any of his own work. But the decedent is being enriched very well through Paul's work. It's really a case of fairness is what it comes down to. And back to the waiver of the application of the Dead Man's Act, it just prejudiced the entire case. Did you ever raise that in the trial court? I didn't handle the trial. I don't believe it was raised. Why isn't it waived here? I believe that the court has the power of sui sponte to prevent an injustice by raising it either at the trial level, and Judge Sullivan mentioned it in the order, that Paul was hampered by application of the Dead Man's Act. And, of course, the Second District has the power of sui sponte to do that. I can't answer directly why the trial attorney didn't raise it, but I know he was bombarded from three or four attorneys based on the Dead Man's Act and could not get Paul's testimony in regarding the arrangement between the decedent and between Paul. And that's really the hitch of the case is that that is so prejudicial to the outcome of the case that that should at least be examined. The Dead Man's Act? Yes, as far as Paul should have the opportunity to testify as a witness and the opposition should have an opportunity to cross-examine about the arrangement between why someone works for 30 years for no pay. All right, counsel, you will have an opportunity to reply. Thank you. Good morning. Good morning. May it please the Court. Mr. Kasichoff did have the opportunity to testify as to what his beliefs were, whether he had a belief that he was going to be paid, whether he believed that there was a will that would benefit him, all of the things that counsel was just mentioning, there was an opportunity in the trial court for him to testify. His belief is not something that would be a transaction in the presence of the decedent. It's not barred by the Dead Man's Act. There was never a question asked on that point. So counsel's assertion... There was never a question asked what he believed he was to be paid for. That's correct. And if you look at the testimony, you'll see that. So the assertion that he believed that eventually he was going to get paid is not supported by the record. There's no evidence to that. What about the interrogatories? The interrogatories cannot be offered for the truth of the matter asserted here. The motion that was brought by one of three or four different representatives of the estate was intended to show that there was no disclosure made. It was not intended to show that the answers of the opponent were, in fact, truthful or that this was somehow evidence in the case. The case that's cited by counsel that tends to show that something like this might be considered as evidence or there might be a waiver, as it were, as to the bar, really relates to a summary judgment action where the court is asked by the Code of Civil Procedure to consider those interrogatories or depositions as evidence for purposes of ruling on that motion. And in fact, that is an express exception under the statute concerning summary judgment. We don't have that here. What we have is instead a motion that's trying to show that the interrogatories were unfair in the sense that they were trying now to introduce a witness that was never disclosed. And it's that disclosure or nondisclosure that was the basis of the motion and why those interrogatories were attached. This is not a motion for summary judgment. It is not the same thing at all. Didn't the trial court find that the plaintiff was working gratuitously? Yes, that's my understanding. And it was based upon the fact that the trial court determined that this was equivalent to a familial relationship? That's my understanding. Is there any case law that you're aware of that talks in terms of familial relationships that release and discharge wages and salaries for working in a business as opposed to taking care of someone in their home or doing household duties? I have not found such a case, no. So essentially this is a case of first impression? I believe it is. Mr. Lutry, the trial court went through the steps for Quantum Merriwet and Paul pretty much met every step for Quantum Merriwet except when it came to did he perform the services gratuitously. And that's when the trial court then went off to the familial relationship indicating if you're in a familial relationship the case was clear that you're not entitled to be compensated. Why is it that his son John made a claim? And what was that for? My understanding of John Walsh's claim is that it is a claim for services he provided in I think lawn care and lawn maintenance, maybe there was some landscaping involved. That's about all I know of that claim. And I think the claim was for about $40,000, maybe $45,000. I'm just going by memory. So then why is it that Paul should not be entitled to make a claim according to Judge Sullivan but John is allowed to make a claim? Well, John certainly is allowed to file a claim. We are objecting to John's claim on the same basis. And, in fact, that is still pending, and we expect to prevail on that basis as well. Did John make claims relative to work as an upholsterer? No. And is that because he got paid when he submitted bills for work as an upholsterer? I don't know the reasoning behind that, but I assume that there is some reason. Mr. Smith said that the son was paid for his upholstery. I believe that's correct, but I also believe that his client was paid. I think Your Honor pointed out that there are tax returns for Honora Woods, which is a corporation which the accountant testified all the expenses of the business were run through there. You'll notice that there was nothing in those tax returns showing compensation to either John or Tammy, yet both of them testified that they were paid. Yes, but Tammy indicates, I thought, that Mr. Smith said that she was, in fact, compensated and John was compensated, but there's nothing to indicate that Paul was compensated. I agree, but I think the best plaintiff's burden is to show them one thing or the other. Here, this is the precise type of case that the Dead Man's Act was designed to address because it is a he said, she said situation. The only people who can know whether or not he was paid or not are the decedent and him. So for him to come in and testify in his own self-interest that he was not paid, which, by the way, the court, I think, in my opinion, the court expressly denied that under the gun case so that we don't have any evidence that he was never paid. But that being said, the fact that, you know, his testimony has to be looked at with, I think, some real scrutiny here because he's coming in to say that isn't what the trial court found. Get it? I thought the trial court found that he wasn't entitled to money, not because he was already paid, but because he was working gratuitously. I agree. I agree, and I think that that was the right decision. So if we remanded it back, then it would seem that after he presented his proofs, you could or the estate could establish or the heirs could attempt to establish that he was, in fact, paid. Or his services weren't worth what he claims they were. Those would be potential defenses, yes. But I do believe, though, that the trial court properly applied the law, and I do believe that counsel and I agree that the White case is controlling here, which, in my view, makes this a case of manifest weight  and applying those facts to the case that we agree applies. And with a manifest weight, there has to be the absence of any evidence in support of the trial court's finding for the appellate court to reverse. Here we have very clear evidence, and the order recites that evidence. And I'll recite it again here. They lived together in the decedent's home. There was no evidence that he was restricted in any way to his room. The house had a pool, five bedrooms. He had a television in his room. They ate together, the decedent and Paul Kazikoff. They worked together. They shopped together. They spent their holidays together. The decedent took care of the claimant's health insurance, cell phone, expenses, general expenses, clothing, that sort of thing, and the decedent served as the claimant's driver. We have quite a bit of evidence here, which, by the way, goes way beyond what we saw in the White case to show that these folks are, in fact, family members or at least treating each other as family members. There's even testimony that they called each other dad and son. Some of the documents that were introduced as exhibits show Paul as Paul Walsh. Wouldn't that be consistent with the execution of the will that Paul had in his possession or a copy? Well, there was a photocopy of a will in a safe to which Paul did not have a combination. And, you know, first of all, I think there's a significant question as to whether or not that will is a legitimate will. But assuming that for a moment that it was when it was signed and it was proper wills. Was that will signed by the first wife prior to her death or was that signed by the second wife?  I apologize, but even if we assume for a moment that it is a perfectly legitimate will when it was signed. We're talking about the one in the 1996 one. Yeah, the one that was, I think, written on a piece of paper. It was said that Ann Walsh, the first wife, had been out of the picture for 30 years. So it would have to be. Then your honor is probably correct. Yes. Go ahead. OK, I'm sorry. But assuming that that was perfectly legitimate when it was signed. The fact that it was in last in the possession of the decedent. He was the only one who had the combination to that safe. And the fact that the original cannot be found. There's a legal presumption that that was revoked. Or destroyed. Well, I suppose that's how you can revoke a will is by destroying it. True. Very much so. And that will was never offered. That photocopy was never offered. There's really, it's not an effect. The only place that that will appears, and I would call it a purported will, is as a photocopy attachment to those interrogatories that were on that motion. Again, that is not evidence in this case. That was a motion attaching documents. That is not something that was introduced as evidence at all. And so the court, in my view, cannot even consider that. At least it would not be proper. Did the plaintiff ever had an IQ test? No, and there was no evidence offered to show that he had any form of diminished mental capacity whatsoever. Well, was there anything to show that he had a capacity, and if so, what the nature and extent of it was? No. Just because you show that they're not diminished doesn't necessarily mean they're a genius either. So, as far as we know, this person is, what, unknown? I think we're entitled to a presumption that he has his full faculties, unless shown otherwise. Think dominant? Yeah, and I believe that if that was an issue, that he had the opportunity to demonstrate that in the trial court. This notion that there was a waiver, and it's now somehow unfairly... All right, since you have a question. Yes, I do. Tammy was the bookkeeper, correct? Yes. Well, only for about three weeks. For how many weeks? About three weeks. Then who was the bookkeeper for the other weeks? The decedent. The decedent? Yes. Was Tammy told how to prepare the books by the decedent or by the plaintiff? Neither. To my knowledge, she just went in and just tried to make sense of what was happening. Okay, so at least Paul didn't tell her how to review or audit the books. To my knowledge, that did not happen, but again, that's not in the testimony. And so if the decedent was the one who was writing the books and it doesn't contain any compensation for the plaintiff, then would it be safe to say that either the decedent truthfully was recording that there was no compensation or he was delusional when, in fact, there was compensation, but he wasn't reporting it? First, and I have to back up one step, there was never any introduction of corporate records of any kind in the trial court, and I have not seen or heard that there were any corporate records. The only thing that we have are tax returns that I think do not show compensation to any person. So if I were asked to speculate, I guess, I mean, anything could have happened there. It's hard for me to believe that the individual would work for 30 years without compensation. That's a job I would not accept. Well, you have testimony from the daughter and the son that they've been paid. Correct, and I believe also that Mr. Kosikoff was paid. So your point is that both Tammy and John were paid, but there's no record of it, and therefore the assumption is Paul was paid and there's no record of it. And I think that's part of what the trial court considered, even though that's not necessarily how the trial court ruled. I think that the reasoning used following the White case and the other cases on point was correct, but I think that had that not been the case, had the court not been required to follow that precedent, the court likely would have reached the same conclusion. In fact, there's a case, McRoberts, which was cited in the briefs, that does not rely on the presumption of familiar relationship, but instead says there is a presumption when someone works for 30 years without asking for payment that they're doing so gratuitously. When someone works in that, in the McRoberts case, it was a similar situation. Someone had worked for another person for about 30 years, and they came in and made a claim very similar to what we have here, and the court said, well, if you work for 30 years without asking for payment, we're going to presume that you did so gratuitously. Because, you know, once someone passes away and you come in and try to make a claim against their estate when they're no longer alive to dispute what you're saying, it's just inherently unfair. And so I think that's why the Dead Man's Act is there, and I think that's why this presumption of McRoberts applied. Well, if they had taken the business records from the decedent in McRoberts and had established that there was a compensation of any sort, wouldn't it be substantive evidence that, in fact, the Dead Man's Act would have a utilitarian purpose in that situation where the evidence seems to indicate that there was, in fact, some sort of remuneration or compensation, whereas here there does not appear to be any record of direct compensation? And I thought you said the income tax returns indicate that there's none. So where is there any inference that there was any kind of compensation? Only that Paul Kosnikoff worked for 30 years without getting paid, allegedly. But I think that that is something that the court can consider. Common sense is certainly something the court can consider in, you know, reviewing this type of question. Thank you. Want to sum up? I'll just add one last point if you have time. The idea that there's been prejudice here as a result of the interrogatories being attached, this is something that they knew about at trial. This is something that could have been raised at trial. What is prejudicial is to not introduce that, find out that you've lost the case, and then try to introduce it later in order to get a remand. That's second fighting the apple. That's all I had to say. Thank you very much. Thank you. Do you wish to reply? Your Honors, it's really a case of fairness. I examined the McRoberts decision that was in the opposing counsel's brief from 1964. It doesn't apply here. They rely on a Rhode Island Supreme Court case in McRoberts. And what they say here is the natural presumption is that service was rendered as a friendly act. Well, Paul may have had a friendship with the deceased, but he believed he was going to be paid at some point. And he brought those conversations to light in that written interrogatory that was inadvertently admitted. The counsel said that your client did have an opportunity to testify and could have testified as to his beliefs. Well, as far as the transcript that I reviewed, any time he would discuss an event or discuss any conversation that was in the presence of the deceased. His beliefs that he had in a room all by himself, he never testified to that. That may be possible. I didn't read the transcript that way. I read the transcripts that every time a conversation in the presence of the deceased was barred by the Dead Man's Act, and each of the four counsels objected to that vigorously. I think the point is your client was never asked what was your understanding, what was your belief. Now, the basis for that opinion might have gotten into the Dead Man's Act, but he was never asked what his belief is. I can't tell you either way, but I didn't read it that way in the transcript. Okay. It's a case of fairness, and at the very, very least, Paul should be put on the witness stand again to testify to those beliefs. And the information in that written interrogatory is in a copy of that will. He should be questioned about that, how he had obtained that will from the deceased. That will didn't come from the safe. We never saw the documents from the safe. The two daughters were adamant about getting to the safe and drilling it out. All cash was returned. So apparently there's something in the locked box, the strong box, that was taken out. Maybe an original will.  I don't know. The opposition waived the Dead Man's Act. It's possible they did it inadvertently to bar testimony of a CPA, but they waived it none the same. Lady Justice may be blind, but Lady Justice is not deaf and dumb. There is a will of some sort or a copy of a will. It is signed. It is notarized. And there's written interrogatories as to Paul's relationship with the deceased. Thank you for the opportunity to oral argue this case. Thank you very much. We are in recess.